UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LATEACHIA C.<br>o/b/o K.N.A., | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Case No. 1:17-cv-0752-CCR<br>) |
| NANCY A. BERRYHILL,<br>Acting Commissioner of Social Security, | )<br>)<br>) |
| Defendant. | )<br>) |

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND GRANTING THE COMMISSIONER'S MOTION FOR JUDGMENT ON THE PLEADINGS**
(Docs. 11 & 12)

Plaintiff Lateachia Campbell ("Plaintiff") brings this action, on behalf of her minor child, Kyla N. Alexander ("K.N.A."), for Supplemental Security Income ("SSI") under the Social Security Act ("SSA"). On February 28, 2018, Plaintiff filed a motion for judgment on the pleadings seeking to reverse the decision of the Commissioner that K.N.A. is not disabled. (Doc. 11.) On April 30, 2018, the Commissioner filed a motion for judgment on the pleadings asking the court to affirm its decision. (Doc. 14.) Plaintiff replied on May 21, 2018, at which point the court took the pending motions under advisement.

Plaintiff challenges Administrative Law Judge ("ALJ") Lynnette Gohr's decision, arguing she failed to properly evaluate K.N.A.'s limitations in two of the six functional domains described in 20 C.F.R. § 416.926a(b)(1)(i)-(vi). The Commissioner asserts that no error occurred and the ability to reach divergent conclusions does not create one provided substantial evidence supports the determinations by the ALJ.

Plaintiff is represented by Anthony J. Rooney, Esq., Ida M. Comerford, Esq., and Kenneth R. Hiller, Esq. The Commissioner is represented by Special Assistant United States Attorneys Elizabeth Rothstein and Richard W. Pruett.

**I.   Procedural Background.**

On February 13, 2014, Plaintiff filed an application for SSI on behalf of K.N.A. alleging disability as of September 30, 2013. Her claim was denied on May 20, 2014. On May 29, 2014, she filed a written request for a hearing. On July 14, 2016, Plaintiff and K.N.A. attended a hearing which was held before ALJ Eric L. Glazer[1] in Buffalo, New York. A supplemental hearing was ordered for September 2016, but Plaintiff did not appear. On September 30, 2016, ALJ Gohr issued a decision finding that K.N.A. was not disabled. On June 5, 2017, the Appeals Council denied Plaintiff's request for review. As a result, ALJ Gohr's determination stands as the Commissioner's final decision.

**II.   Factual Background.**

K.N.A. was born on August 30, 1999. At the time of the ALJ's hearing, she was approximately sixteen years old and had completed the tenth grade. Plaintiff alleges K.N.A. is disabled as a result of attention deficit hyperactivity disorder ("ADHD"), poor concentration, mood swings, and depression. Her IQ testing has yielded full scale IQ scores of sixty, eighty-one, and ninety-one.

K.N.A. has struggled behaviorally and academically since she entered school including an unsubstantiated report that she failed first grade. In October 2013, she was placed in a group home because of behavioral issues. Her social worker reported that K.N.A. was hospitalized in a psychiatric unit from December 8 to 10, 2013, but no medical records supporting this claim were submitted to the ALJ.[2]

---

[1] The parties' briefing suggests ALJ Lynnette Gohr presided over the July 14, 2016 hearing, but the record appears to indicate that ALJ Glazer presided over parts of it. *See* AR 102, 104, 122, 187, 201, 276, 282, 303.

[2] The examining state consulting physician's report stated that K.N.A. had never been hospitalized for psychiatric reasons. (AR 551.) Her "Global Subject Activity Report" from the Jamestown, New York Police, however, lists a mental health pick-up for December 8, 2013. (AR 529.)

In late 2013, K.N.A. was placed in the Gustavus Adolphus Family Services residential treatment facility ("Gustavus Adolphus"). (AR 250.) On December 6, 2013, Kristin Saunders, a social worker at Gustavus Adolphus, performed an initial assessment of K.N.A, noting that K.N.A. had been referred to Gustavus Adolphus because she needed "a higher level of supervision" after she failed to attend school, was insubordinate, verbally and physically aggressive, defiant toward authority, engaged in thefts, and had problems with substance abuse. (AR 327.) Ms. Saunders reported that K.N.A. stated she was able to get good grades if she attended classes and completed her assignments. Ms. Saunders opined that K.N.A.'s "truancy and negative behavior have had an overall negative effect on her educational achievement." *Id.* Although ADHD medication was recommended, K.N.A. refused it. K.N.A.'s responses to the "Trauma Symptom Checklist for Children" indicated "slight elevations in the categories of depression, anger and dissociation" and her "Child and Adolescent Needs and Strengths" assessment suggested treatment areas in anger control, substance abuse, and delinquent behavior. (AR 327-28.)

On January 27, 2014, Douglas Penhollow, the Treatment Coordinator for Gustavus Adolphus, provided a summary of K.N.A.'s progress. He noted that she had demonstrated an ability to follow the program's rules and routine "when she [chose] to do so" but had "ma[de] the choice not to on most occasions." (AR 345.) He stated that K.N.A. was capable of completing all of the cleaning tasks assigned to her and showed improvement in fulfilling her expected tasks. She was working with staff to develop life skills, attending school on a regular basis, and had demonstrated she was capable of meeting the school's expectations.

Mr. Penhollow noted that, at times, K.N.A. was rude, disrespectful, and aggressive toward staff "without provocation[,]" although her behavior toward staff was improving. (AR 346.) He indicated she was "sneaky" and that staff was working with her to minimize her attempts to manipulate staff and peers. *Id.* K.N.A. also struggled with taking responsibility for her actions. One staff member reported that K.N.A. googled her personal information and used it to make threats and manipulate her. Mr. Penhollow

3

noted that while K.N.A. had made some progress, she had difficulty maintaining a "steady pattern of consistent positive behavior[.]" (AR 348.) The treatment team recommended K.N.A. continue the program at Gustavus Adolphus.

Karen Storinge, a special education teacher at Gustavus Adolphus, completed an undated teacher questionnaire for K.N.A. when she was in eighth grade. Ms. Storinge indicated K.N.A.'s functioning appeared age-appropriate in the areas of attending and completing tasks, interacting and relating with others, and moving about and manipulating objects. She reported that K.N.A. found it challenging to handle frustration appropriately, respond appropriately to changes in her own mood, and "[use] appropriate coping skills to meet daily demands of [the] school environment[.]" (AR 271.) She acknowledged that K.N.A. had been diagnosed with a mood disorder but indicated that there were no "side effects associated [with the disorder] that interfere[ed] w[ith] the child[']s functioning[.]" (AR 272.) She reported that K.N.A. was receiving extra help in math from a tutor twice a week.

On March 17, 2014, Mr. Penhollow completed another status report describing K.N.A.'s progress between January and March. He noted a number of issues with K.N.A.'s behavior, including that she was found attempting to sneak a razor blade into school, had an altercation with another student during which she threw a garbage can and broom at the student, verbally harassed a third grade student, was found smoking cigarettes outside a classroom window, punched a staff member in the face, and was caught with marijuana. In February of 2014, K.N.A. participated in a physical attack on a staff member initiated by another student.

With regard to her educational development, Mr. Penhollow expected K.N.A. to successfully complete eighth grade as she finished the majority of her assignments on time with minimal assistance. K.N.A. was also taking her medications and attending weekly counseling. The staff at Gustavus Adolphus believed K.N.A. had demonstrated some progress and recommended she remain in the program. Her report card dated April 25, 2014, indicated that she was improving academically and behaviorally, although she

was easily distracted. Her third quarter grade point average ("GPA") was an 81.45 out of 100.

On June 30, 2014, K.N.A. was discharged from Gustavus Adolphus at which time Ms. Saunders reported that K.N.A. "was somewhat responsive to the support that was offered to her; however, she continued to be non-compliant with school and unit programming. [She] was at times, disruptive to the point of aggression." (AR 544.) Ms. Saunders recommended further counseling to help K.N.A. manage her anger and improve her decision-making skills. She concluded "[K.N.A.] has many strengths which include being resourceful to meet her needs and the desire to improve her relationship with her mother. She was cautious about returning to her home environment; however anticipated a successful discharge to her mother's care." *Id.*

As a result of her February assault on the Gustavus Adolphus staff member, from October 2, 2014 to November 13, 2014, K.N.A. attended the Brentwood Residential Center for Girls in Dix Hills, New York. While at Brentwood, she attended ninth grade and received an academic average of 60 out of 100 in English, Global Studies, Integrated Algebra, Living Environment, and Career Financial Management. She earned an academic average of 75 out of 100 in Physical Education. On November 13, 2014, she was transferred to Cayuga Centers in Auburn, New York, where she remained in residential treatment until January 26, 2015.

While residing at Cayuga Centers, K.N.A. attended Auburn High School. According to her report card for the period ending December 3, 2014, K.N.A. had a 73.67 out of 100 GPA, although she was not eligible for grades in Algebra, Biology, or Spanish. Her biology teacher noted that K.N.A. was courteous and showed good effort, but failed tests and "trie[d] to achieve but ha[d] trouble mastering the subject." (AR 455.) An Individualized Education Program ("IEP") dated December 3, 2014, stated that K.N.A. "struggle[d] with mood regulation and significant behavioral outbursts. She require[d] close supervision to ensure that she [was] behaving appropriately . . . [and] a small classroom setting as her emotional needs c[ould not] be supported within the general education setting." (AR 456.) A second report card from Auburn High School

5

dated January 23, 2015, reported no grades or GPA for K.N.A. but listed her class rank as 258 out of 626.

In January 2015, K.N.A. was released from residential treatment and sent home. A draft IEP from Buffalo City School District for a meeting on February 13, 2015, stated that "[K.N.A.] is a likeable student. She has positive relationships with most of her peers and staff. She has shown marginal growth by trying inconsistently to stay out of trouble." (AR 478.) It continued:

> [K.N.A.] enjoys and seeks adult attention and will usually converse inappropriately with adults. . . . [K.N.A.] has historically had difficultly taking responsibility for any negative behaviors. . . . She will redirect with several prompts and act in a socially appropriate manner. The goal is to make this a permanent behavior. [She] has a unique sense of humor and a unique personality which can make her a pleasure to be around.

*Id.*

It is unclear from the record why K.N.A. returned to residential treatment at the Wyndam Lawn facility on July 21, 2015. Thereafter, on December 9, 2015, she was transferred to Taberg Residential Center ("Taberg") for making a threat to kill someone. A report from Taberg dated January 25, 2016, indicates that "[K.N.A.] has demonstrated the ability to display appropriate behavior . . . and will be released from Taberg on [February 18, 2016]. [K.N.A.] will return home to her mother and receive aftercare services from the Buffalo CMSO office." (AR 174.) The report noted that K.N.A. had adjusted well to the program with minimal issues, had only one significant behavioral incident, and had a "positive peer leadership [role] and remained focused on her goal of going home." *Id.* At the time, K.N.A. was in the ninth grade and had an IEP for emotional disturbance.

In February 2016, K.N.A. was discharged from Taberg with an ankle monitor. She returned home and attended Riverside High School. Angela Mosseau, a special education teacher at the Riverside Institute of Technology, authored a June 20, 2016 progress report which indicated that K.N.A. had not achieved her social, emotional, and behavioral goals, and had made inconsistent progress toward her goal of improving in math and completing four out of five assignments independently and on time. K.N.A.'s

6

June 2016 report card indicated that she had failed Global Studies, English 10, Earth Science, and Algebra, and was required to attend summer school. Ms. Mosseau cautioned that the report card was only one report to consider in evaluating K.N.A.'s overall academic achievement.

### A. K.N.A.'s Medical and Mental Health History.

On April 8, 2013, Plaintiff accompanied K.N.A. to a medical appointment with Gale R. Burstein, M.D., to address K.N.A's behavioral problems and sore throat. Plaintiff was concerned that K.N.A.'s medication, Focalin, was not improving her behavior, and Plaintiff requested a higher dose.

On March 20, 2015, Michelle M. Myers, M.D. and Dr. Parmington saw K.N.A. for a routine well child exam. Dr. Myers noted that K.N.A. was living at home but had recently been in a group home for behavioral issues. At the time, she was attending Riverside High School and was in the ninth grade. K.N.A. reported that she did not like the other students and that there were lots of fights at the school. She had previously been in special education classes, but was trying regular education and was involved in some clubs and activities. She stated that she enjoyed reading, was worried she was not keeping up in school, and was having difficulty focusing. She was also having trouble sleeping, unless she took Abilify. She was still being prescribed Focalin and was also taking Risperdal and Adderall. Dr. Myers noted that K.N.A.'s behavior had been fine since she returned home. K.N.A. reported no drinking or use of marijuana, she planned to obtain a summer job, and was visiting with her father every other week. The results of Dr. Myers's physical and mental examination of K.N.A. were normal. Continuing with ADHD treatment and counseling was recommended.

At a May 6, 2015 exam, Anna Socha, M.D., evaluated K.N.A., who was seeking a prescription for birth control. K.N.A. reported that she was no longer taking her ADHD medications and was homeschooled. Dr. Socha described K.N.A.'s general health status as "good" and her physical and mental exam yielded normal results. (AR 420.)

7

On February 25, 2016, Karla A. Sherwood, PNP, evaluated K.N.A. at another well child exam. Nurse Sherwood indicated that K.N.A. was in good health and Plaintiff planned on homeschooling K.N.A.

On November 6, 2013, Israr Abbasi, M.D., a child psychiatrist, and Gust Verleni, P.A., conducted a psychiatric evaluation of K.N.A. The evaluation noted that K.N.A. struggled with focus and concentration in school. K.N.A. denied any attempted suicides, explaining she did not intend to kill herself but had threatened to do so because she was angry. She reported being tearful a lot of the time. K.N.A. indicated she used to take Ritalin for her ADHD but had ceased taking it two months ago. A mental status exam revealed that K.N.A. was alert and cooperative with a normal mood, normal speech, and no apparent anxiety, but at times appeared depressed. She did not appear goal-oriented and her focus and concentration were poor. Dr. Abbasi and PA Verleni assessed K.N.A. to have a Global Assessment of Functioning ("GAF") score of sixty, which indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.[3] Dr. Abbasi and PA Verleni suggested K.N.A. could benefit from counseling but had refused psychotropic medications to treat her ADHD as well as medications to address her symptoms suggestive of a mood disorder and depression.

On January 8, 2014, Dr. Abbasi and PA Verleni re-evaluated K.N.A. K.N.A. was taking medication to address her behavioral problems and reported that it was helping. Feedback forms reviewed by Dr. Abbasi and PA Verleni suggested that K.N.A. was sometimes disrespectful and required significant redirection in order to complete tasks. K.N.A. complained that the residential treatment staff was rude to her. Dr. Abbasi and PA Verleni observed that K.N.A. was alert, oriented, cooperative, and able to sit still and

---

[3] GAF scores are of limited relevance to a SSA disability determination. *See* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injuries, 65 Fed. Reg. 50746, 50764-5 (2000) (stating a GAF score "does not have a direct correlation to the severity requirements in [the SSA's] disorders listings."); *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 415 (6th Cir. 2006) ("[T]he Commissioner has declined to endorse the [GAF] score for use in the Social Security . . . disability programs, and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings.").

answer questions appropriately. She was focused and spoke normally. Her "[j]udgment and insight [were] fair." (AR 334.) Dr. Abbasi and PA Verleni assessed K.N.A. to have a GAF score of seventy, which represents "some mild symptoms . . . or some difficulties in social, occupational or social functioning[.]" (AR 25.)

K.N.A. had a follow-up appointment with Dr. Abbasi and PA Verleni on March 5, 2014. She was taking Celexa to treat her depression and stated that she wanted to be discharged to live with her mother. Dr. Abbasi and PA Verleni observed that K.N.A. maintained eye contact, had a "bright" mood, and an appropriate affect. (AR 333.) Her speech was normal and she presented as goal-oriented with intact judgment and insight. They recommended K.N.A. continue with her medication and work on improving her socialization and problem-solving skills. Her GAF score was eighty, which indicates that if symptoms are present, they are "transient and expectable reactions to psychosocial stressors[.]" (AR 25.)

On May 28, 2014, Dr. Abbasi and PA Verleni re-evaluated K.N.A. who reported she was permitted to visit Plaintiff at home every other weekend. Plaintiff reported that these visits were going well. Although there were concerns that K.N.A. was not taking her medications, she denied this and claimed that her mood was stable. K.N.A. stated she was having difficulty sleeping and was reporting night terrors, but otherwise doing "fairly well[.]" (AR 545.) Dr. Abbasi and PA Verleni observed that K.N.A. was alert, maintained eye contact, and her judgment and insight were intact. Her GAF score was eighty.

**B.    State Agency Consulting Assessments.**

On August 24, 2016, Christine Ransom, Ph.D., performed a psychiatric examination of K.N.A. in connection with Plaintiff's application for SSI. Dr. Ransom noted that K.N.A. had received treatment for ADHD in the past. Plaintiff told Dr. Ransom that K.N.A.'s behavior had improved significantly since her treatment in group homes from late 2015 to early 2016. K.N.A. was not taking medications to treat her behavioral issues and was not attending counseling. Plaintiff described K.N.A.'s recent behavior as "a little bit shaky" and explained that she was hoping K.N.A. would resume

9

taking medications and attending counseling. Plaintiff stated that K.N.A. had mild difficulty following through with tasks and exhibited mild irritability. Dr. Ransom recorded that there were no reports of drug or alcohol use. K.N.A.'s mental status exam was normal; she was described as cooperative and socially appropriate with a neutral mood, intact attention and concentration, and appropriate attention throughout the exam. Dr. Ransom opined that K.N.A. would have "mild difficulty attending to, following and understanding age appropriate directions, complet[ing] age appropriate tasks, [and] adequately maintain[ing] appropriate social behavior" due to her ADHD. (AR 553.) The results of her evaluation were thus deemed "consistent with a mild psychiatric condition, which will not significantly interfere with [K.N.A.'s] ability to function on a daily basis." *Id.*

In May 2014, Cheryl Butensky, Ph.D., a Department of Health and Human Services reviewing psychologist, provided a non-examining assessment of K.N.A. She opined that K.N.A. had less than marked limitations in the domains of acquiring and using information; attending and completing tasks; interacting and relating to others; and caring for herself, with no limitation in the domains of moving about and manipulating objects and health and physical well-being.

### C. Plaintiff's Function Report for K.N.A.

On January 18, 2014, Plaintiff completed a function report on behalf of K.N.A. It indicated that K.N.A. attended school full-time and had no limitations on her ability to communicate. K.N.A. could read and understand sentences in comics, books, and magazines, spell words of more than four letters, add and subtract numbers greater than ten, and understand, carry out, and remember simple instructions. She could tell time using a digital clock, had difficultly multiplying and dividing numbers larger than ten, and could not make correct change.

With regard to her social activities, Plaintiff indicated that K.N.A. had friends her own age and could "sometimes" make new friends, did not generally get along with her other adults, or school teachers, and did not play team sports. (AR 240.) Plaintiff reported that K.N.A. did not wash or put away her clothes, help around the house, study

or do her homework, keep out of trouble, or obey rules. However, K.N.A. was able to take care of her personal hygiene, cook a meal for herself, get to school on time, take her medication, avoid accidents, and ask for help when needed. Plaintiff stated that K.N.A. worked on arts and crafts projects and kept busy on her own, but that most of the time she did not finish the things she started.

### D. Plaintiff's and K.N.A.'s Testimony at the July 14, 2016 Hearing.

At the ALJ's July 14, 2016 hearing, K.N.A. testified that she had been living with her sister for a couple of months due to arguments with her mother. She acknowledged that she had a history of running away from group homes and stated she had done so because she did not like to be around people. She was upset by how people looked at her, and often felt like people were laughing at her. She stated she was more comfortable with her family. When asked about fights at school, K.N.A. stated that if she felt like people were talking about her, she would run away. If she was unable to run away, she would "address them" which led to conflicts. (AR 111.) She explained that one fight she "jumped" into was because a staff member was fighting her friend. *Id.* She described herself as impulsive and testified that medication, counseling, and support groups did not help with her anger or the other things with which she struggled.

When asked about her grades, K.N.A. reported not finishing the year with good grades, which she attributed to "hanging with the wrong people." (AR 115.) She acknowledged she had not attended class or completed her homework. She stated that at school she was just given work and was sometimes afraid to ask for help. When asked about her future interests, she responded that she wanted to be a surgeon.

K.N.A. testified that she had some friends in her neighborhood, four friends at school, liked basketball, English, and science, and competently completed chores at her sister's house. She testified she had received detention only for being late and had not been in any fights at school. When asked about her weaknesses, K.N.A. responded that her negative thinking was a weakness because if she thought differently, she would probably have more friends. Once she made friends, she was able to retain them. She

testified that she had "anger issues[,]" was "not afraid to say anything[,]" had "a smart mouth[,]" and "g[ot] triggered fast[,]" but could be nice. (AR 121.)

### III. Application of the Three-Step, Sequential Framework.

Under the SSA, an individual under the age of eighteen is entitled to SSI benefits when he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). A three-step, sequential evaluation process is used to determine whether an individual under the age of eighteen is disabled. 20 C.F.R. § 416.924(a)-(d); *see also Phelps v. Colvin*, 20 F. Supp. 3d 392, 398 (W.D.N.Y. 2014). First, the ALJ determines whether the child is engaged in any substantial gainful activity. 20 C.F.R. § 416.924(b). If the child is engaged in substantial gainful activity, he or she is not disabled. 42 U.S.C. § 1382c(a)(3)(C)(ii). If the child is not engaged in substantial gainful activity, the ALJ proceeds to Step Two. At Step Two, the ALJ determines whether the child has a medically severe impairment or combination of impairments that cause "more than minimal functional limitations[.]" 20 C.F.R. § 416.924(c). At Step Three, the ALJ determines whether the child's severe impairment(s) "meet[s], medically equal[s], or functionally equal[s]" the criteria of any listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 416.924(d).

If a child's impairments do not meet or equal a listed impairment, the ALJ will consider how a child functions in the following six domains: "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and (vi) Health and physical well-being." 20 C.F.R. § 416.926a(b)(1). A child will be considered disabled if his or her impairments "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a). A "marked" limitation exists when the child's impairments "interfere[] seriously with [his or her] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation exists when the child's impairments

"interfere[] very seriously with [his or her] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).

ALJ Gohr determined that K.N.A. had not engaged in substantial gainful activity since the date of her February 13, 2014 application through the date of her decision. At Step Two, she found K.N.A. to have the severe impairments of "[ADHD]; a behavior disorder; a mood disorder; and obesity[.]" (AR 22.)

At Step Three, ALJ Gohr concluded that K.N.A. did not have an impairment or combination of impairments that met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subpart P. Appendix 1. She thereafter determined that K.N.A. had a "less than marked limitation" in acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for herself. (AR 27.) She further found K.N.A. to have no limitations in moving about and manipulating objects and in health and physical well-being. Because K.N.A.'s impairments did not result in marked limitations in two domains of functioning or an extreme limitation in one domain of functioning, ALJ Gohr concluded that K.N.A. was not disabled from February 13, 2014 through September 30, 2016.

## IV. Conclusions of Law and Analysis.

### A. Standard of Review.

In reviewing the Commissioner's decision, the court "conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (internal quotation marks omitted). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014). "It is the function of the Secretary, not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility

13

of witnesses, including the claimant." *Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984) (internal quotation marks omitted) (alteration in original).

### B. Whether the ALJ's Functional Equivalence Determination is Supported by Substantial Evidence.

Plaintiff contends that the determination that K.N.A. had less than marked limitations in the domains of attending and completing tasks and interacting and relating with others was not supported by substantial evidence because ALJ Gohr failed to consider whether K.N.A.'s improvement was based on a structured special education environment and failed to compare K.N.A. to her same-aged peers. The Commissioner responds that ALJ Gohr examined K.N.A.'s behavior in a variety of settings, compared her to her same-aged peers, and properly found that many of K.N.A.'s behavior challenges were not caused by a medical impairment.

#### 1. Attending and Completing Tasks.

Within the domain of "attending and completing tasks," an ALJ considers how well a child can "focus and maintain . . . attention, and how well [the child can] begin, carry through, and finish . . . activities, including the pace at which [the child can] perform activities and the ease with which [the child can] change them." 20 C.F.R. § 416.926a(h). "'Marked' limitation [] mean[s] a limitation that is 'more than moderate' but 'less than extreme.'" 20 C.F.R. § 416.926a(e)(2)(i). "[Adolescents] should be able to . . . maintain [] concentration while reading textbooks, and independently plan and complete long-range academic projects . . . [and] should also be able to organize [] materials and to plan [] time in order to complete school tasks and assignments." 20 C.F.R. § 416.926a(h)(v). A limitation in a domain is not considered unless it is caused by a medical impairment. SSR 09-4P, 2009 WL 396033, at *3 (Feb. 18, 2009) ("[W]e do not consider a limitation in the domain of 'Attending and completing tasks' unless it results from a medically determinable impairment(s).").

Contrary to Plaintiff's contention, ALJ Gohr compared K.N.A. with her same-aged peers, prefacing her analysis with a description of Social Security Administration

14

regulations and rulings which outline the expectations for an adolescent without an impairment in the domain of attending and completing tasks. The ALJ then analyzed the evidence of K.N.A.'s ability to attend and complete tasks and found that K.N.A. had only mild difficulty following through with tasks when her ADHD was untreated as compared to her same-aged peers.

As part of her determination, ALJ Gohr gave great weight to Dr. Ransom's 2016 opinion which found that K.N.A. had only mild difficulty "attending to, following, and understanding age appropriate directions, [and] completing age appropriate tasks[.]" (AR 25.) Dr. Ransom evaluated K.N.A. during a period when she was not taking medications and was living at home. (AR 25.) Dr. Ransom opined that K.N.A.'s psychiatric condition was mild and "would not significantly interfere with her ability to function on a daily basis[.]" *Id.* Plaintiff does not challenge the weight attributed to Dr. Ransom's opinion, which supports the ALJ's determination that K.N.A. had less than marked limitations.

Similarly, Dr. Abbasi's and PA Verleni's assessments from January to June 2014 noted normal mental evaluations and GAF scores within normal ranges. Dr. Butensky, a non-examining reviewing psychologist, opined that K.N.A. had less than marked limitations in this domain. The ALJ gave this opinion only "some weight" because Dr. Butensky had not examined K.N.A., but found her opinion consistent with the record.

Plaintiff cites K.N.A.'s inconsistent and failing grades in June 2016 as evidence of K.N.A.'s marked limitation in this domain, however, throughout the relevant period, K.N.A. acknowledged that she was able to obtain good grades if she attended class and completed her assignments. ALJ Gohr also noted that K.N.A.'s ADHD was well managed by medications when she was taking them. *See Miller v. Comm'r of Soc. Sec.*, 409 Fed. App'x 384, 288 (2d Cir. 2010) (affirming determination that child was not disabled in part because he "and his mother were satisfied with the results of the medications prescribed to treat [his] ADHD; and testimony from [the child] that his medications helped him to focus in class, at least for the most part").

A failure to consider the effect of a highly structured educational setting when determining a child's limitations may constitute reversible error. *See, e.g., Williams ex rel. D.A.W. v. Astrue*, 2009 WL 3754391, at *8-9 (S.D.N.Y. Nov. 5, 2009) ("Improvement based on a structured special education environment and the efforts of teachers and therapists is insufficient to support a finding that [the child's] functional limitations are not marked."); *Marshall ex rel. D.B. v. Colvin*, 2013 WL 12224213, at *6 (N.D.N.Y. July 19, 2013) ("The ALJ's failure to consider the impact of the structured setting and significant support on Claimant's functioning was error."). However, in making her determination in this domain, ALJ Gohr was well aware of K.N.A.'s placements in various structured residential settings as well as her mother's and sister's homes. In the latter settings, Plaintiff reported K.N.A. experienced only mild difficulty following through with tasks and "testing revealed that [K.N.A.'s] attention and concentration were still intact." (AR 28.) K.N.A. thus had only mild limitations regardless of setting, and showed improvement when she made an effort and took ADHD and mood stabilizing medications.

In summary, ALJ Gohr considered K.N.A.'s limitations during periods when she was both in and outside of a structured educational setting, acknowledged K.N.A.'s mild ADHD symptoms, and appropriately concluded that these limitations were not "marked" because they did not "interfere[] seriously with [K.N.A.'s] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2). Because substantial evidence supports the ALJ's conclusion, a remand is not required. *See Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) ("If there is substantial evidence to support the [ALJ's] determination, it must be upheld.").

### 2. Interacting and Relating with Others.

In the domain of "interacting and relating with others," an ALJ considers "how well [the child can] initiate and sustain emotional connections with others, develop and use the language of [the child's] community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others." 20 C.F.R. § 416.926a(i). Adolescents "should be able to initiate and develop friendships[,] . . .

relate appropriately to other children and adults, . . . begin to be able to solve conflicts[,] . . . recognize that there are different social rules for [friends their age] and for acquaintances or adults . . . and should be able to intelligibly express [] feelings, ask for assistance . . . seek information, describe events, and tell stories[.]" 20 C.F.R. § 416.926a(i)(2)(v). Plaintiff asserts K.N.A.'s behavioral problems demonstrate that ALJ Gohr erred in determining K.N.A. has less than a marked limitation in the domain of interacting and relating with others.

ALJ Gohr properly cited and relied upon Social Security Administration regulations that describe same-aged peers and used that standard to evaluate K.N.A.'s capacity to interact and relate with others. Acknowledging K.N.A's behavioral problems and placement in group homes, ALJ Gohr nonetheless found a less than marked limitation based on K.N.A.'s positive relationship with her father and the fact that she "generally got along well with friends and peers[.]" (AR 29.) The ALJ concluded that "[w]hile engaging in treatment and taking her medication regularly, she developed positive relationships with most of the staff, was respectful, even when she was mad or angry, and showed she was able to follow the rules and regulations when she wanted to[.]" (AR 30.)

Substantial evidence supports the ALJ's finding that K.N.A.'s ability to interact and relate with others, when compared with her same-aged peers, did not constitute a marked limitation. The possibility that another decision-maker might reach a different conclusion is not alone grounds for remand. *See McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld."). K.N.A. planned to get a summer job, had a boyfriend, and participated in activities appropriate to her age group. She testified that although she had difficulty making friends, she could retain them and had friends both in school and in her neighborhood. After a physical and mental evaluation, Dr. Ransom concluded that K.N.A. had only mild difficulty in adequately maintaining appropriate social behavior, asking questions and requesting assistance in an age appropriate manner, and interacting adequately with peers and adults. Although K.N.A. struggled

17

behaviorally throughout the relevant period, she was also capable of engaging appropriately with others as evidenced by her status as a peer leader at Taberg and her evaluation by Ms. Storinge. K.N.A's IEP from 2015 indicated that she was a likable student with whom teachers enjoyed working. *See Mohamed v. Astrue*, 2010 WL 2640541, at *4 (W.D.N.Y. June 29, 2010) ("The opinion of a teacher who works with a child on a daily basis and observes her in a social setting with peers, as well as adults, is an invaluable method to ascertain the severity of an impairment and requires careful consideration."). Plaintiff's argument that ALJ Gohr erred in failing to consider the effect of a supportive setting is unsupported by the record because ALJ "first evaluated how [K.N.A.] functions in all settings and at all times, as compared to other children the same age who do not have impairments." (AR 23.) Residential treatment did not appear to have had a significant effect on K.N.A.'s ability to interact and relate with others as her worst behavioral incident, the physical attack on a staff member, occurred while in residential treatment. In March 2015, Dr. Myers noted there were no reports of behavioral problems since K.N.A. had returned home from residential treatment. Plaintiff herself reported only mild behavioral problems as of August 2016, while K.N.A. was living at home. K.N.A. testified at the ALJ's hearing that she was not getting into fights at Riverside and she was given detention only for being tardy.

Although K.N.A. has a history of serious behavioral problems, as the Commissioner points out, the medical evidence in the record does not connect those problems to her impairments. *See* SSR 09-5P, 2009 WL 396026, at *3 (Feb. 17, 2009) ("[W]e do not consider a limitation in the domain of 'Interacting and relating with others' unless it results from a medically determinable impairment(s)."). Because the ALJ's determination in this domain is supported by substantial evidence in the record, including teacher questionnaires and medical evaluations, the court cannot disturb it on appeal even if it might have reached a different conclusion. *See Stanley v. Comm'r of Soc. Sec.*, 32 F. Supp. 3d 382, 390 (N.D.N.Y. 2014) ("If supported by substantial evidence, the Commissioner's finding must be sustained even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence

may differ from the [Commissioner's].") (internal quotation marks omitted) (alteration in original).

## CONCLUSION

For the foregoing reasons, the court DENIES Plaintiff's motion for judgment on the pleadings to reverse (Doc. 11) and GRANTS the Commissioner's motion to affirm. (Doc. 12.)

SO ORDERED.

Dated at Burlington, Vermont, this 24th day of May, 2019.

Christina Reiss, District Judge
United States District Court